O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VAHAN EKSOUZIAN, an individual; CLOUD V. ENTERPRISES, a California corporation; and VAPE A CLOUD, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>BRETT ALBANESE, an individual; CLOUD VAPEZ, INC., a California corporation; and DOES 1-10,<br><br>Defendants. | NO. CV 13-00728-PSG-MAN<br><br>MEMORANDUM OPINION AND ORDER |

## INTRODUCTION

On September 11, 2014, Plaintiffs Vahan Eksouzian, Vape A Cloud, Inc., and Cloud V. Enterprises (collectively "Plaintiffs")[1] filed the Motion To Enforce Settlement Agreement ("Plaintiffs' Motion" or "Pls. Mot. Enf.") now before the Court. (Dkt. No. 167.) Plaintiffs allege

---

[1] Mohammed Nurhussein is a Counter-Defendant in this action and is included within the definition of "Plaintiffs" in the Settlement Agreement at issue before the Court.

Defendants Cloud Vapez, Inc., Brett Albanese, and Full Circle, LLC. (collectively "Defendants") have violated, and continue to violate, Paragraph II of the July 9, 2014 Settlement Agreement ("SA") between and among the parties, because Defendants' "**CLOUD** PEN" mark[2] does not constitute a unitary mark, as required by Paragraph II of the SA. (Pls. Mot. Enf. at 3.) Plaintiffs also allege that Defendants breached the SA by: failing to pay the second of two $35,000 payments required to be paid pursuant to Paragraph II(G) of the SA; and using "CLOUD 2.0" and "CLOUD" on their website, in product advertisements and promotions, and on product packaging following the execution of the SA, in violation of Paragraph II(A) of the SA. (*Id.*)[3]

In response to Plaintiffs' first claim, Defendants argue that their use of the "**CLOUD** PEN" mark conforms to the definition of unitary mark set forth in Paragraph II of the SA. ("Defendants' Opposition" or "Defs. Opp." at 13.) In response to Plaintiffs' other claims, Defendants do not dispute the facts. Instead, Defendants argue that they were fraudulently induced by Plaintiffs to enter into the SA and that Plaintiffs materially breached their obligations under Paragraph II(E) of the SA by disparaging Defendants on social media and during telephonic communications, thus excusing Defendants' failure to meet their obligations under the SA. (*Id.* at 10.)

---

[2]



[3] Plaintiffs' Motion sets forth additional claims regarding Defendants' delays in meeting certain other obligations under the SA. (Pls. Mot. Enf. at 3.) Those obligations have been fully met, if somewhat sluggishly, by Defendants. (Plaintiffs' Supplemental Brief In Support Of Motion To Enforce Settlement Agreement ("Plaintiffs' Supplemental Brief" or "Pls. Supp. Br." at 1.) Further, Plaintiffs failed to immediately comply with certain of their obligations under the SA, including their obligation to refrain from referring to their product as the "original Cloud." (Defendants' Supplemental Brief In Opposition To Plaintiffs' Motion To Enforce The Settlement Agreement ("Defendants' Supplemental Brief" or "Defs. Supp. Br." at 2.) The Court declines to reach these claims, which are now fully resolved.

The Court will first address the issue of whether Defendants' "**CLOUD** PEN" mark is a unitary mark in accordance with Paragraph II of the SA. The Court requested supplemental briefing from the parties regarding the proper interpretation of the term "unitary mark," as used in the SA, and the factors which should be considered by the Court in determining whether Defendants' "**CLOUD** PEN" mark is a unitary mark in accordance with the requirements of the SA.

## DISCUSSION

**I.  DEFENDANTS' "CLOUD PEN" MARK IS NOT A UNITARY MARK AS REQUIRED BY THE SA.**

    **A.  The SA Provisions Regarding Defendants' Use Of "Cloud" Only In A Unitary Mark.**

Paragraph I(D) recites the three essential purposes of the SA as follows:

> [T]he Parties seek to enter into this settlement agreement to fully and finally resolve the Action and any and all claims, rights, liabilities, causes of action and disputes that might exist as of the time of entering into this Settlement Agreement, and to avoid the cost and uncertainty of continued litigation as well as *to make provisions to limit the potential for consumer confusion as the Parties compete in the future*.

(SA I(D)) (emphasis added).

To "limit the potential for consumer confusion" in the market for the compact vaporizer pens sold by both Plaintiffs and Defendants, the SA provides, in relevant part, that: "Plaintiffs may use the word[] CLOUD . . . standing alone as [a] trademark[]" (SA II(B)); "Defendants, and each of them, shall cease using . . . 'Cloud' (*except in combination with another word as a unitary*

*mark, as set forth below* [in Paragraph II(B)]), or any similar derivation thereof (for example, 'Cloud 2,' 'Cloud 3.0,' . . .), in association with any of Defendants' products" (SA II(A)) (emphasis added); "Defendants may use (and Plaintiffs shall not oppose such use) marks including the word CLOUD *provided* such use is *always* accompanied with another word in close proximity to CLOUD *so as to constitute a unitary mark, as defined above* [in Paragraph II(B)]" (SA II(C)) (emphasis added); and "Defendants will not use the term CLOUD standing alone in commerce as a mark" (*id.*).

The term unitary mark as used in the SA is defined as follows:

> "[U]nitary trademark" means a group of words or symbols that are considered a single trademark, that is, where the elements are so closely aligned and situated that the average consumer would view the group of words or symbols as a single trademark.

(SA II(B).) As discussed *infra*, this definition of a unitary mark closely mirrors the common law definition of a unitary mark, as discussed in the applicable precedent and the Trademark Manual of Examining Procedure published by the United States Patent and Trademark Office. (TMEP § 1213.05 (5th ed. 2007).)

The penultimate sentence of Paragraph II(C) of the SA states that: "The size and specific relationship of CLOUD with the other word or words used in close association with CLOUD is within Defendants' discretion except that the word coupled with CLOUD must be in close proximity and be readable." (SA II(C).) Thus, the size and relationship between words used in the creation of Defendants' unitary mark is indisputably a matter over which Defendants have broad discretion. Words used in Defendants' unitary mark are not required to be on the same line, in the same font, or of equal size.

In Defendants' Opposition, Defendants correctly characterize their obligation to use "Cloud" only in a unitary mark as a "key provision" of the SA, which they summarize as follows:

> Defendants can make use of and register trademarks that include the term Cloud[,] so long as the term Cloud is used in close association with another term (e.g. Cloud Penz® and Cloud Pen™). The size and relationship of the words is in Defendants' discretion *so long as it forms a unitary mark* ([Paragraph] II(C)) . . . .

(Defs. Opp. at 3-4) (emphasis added).

In their first Supplemental Brief In Opposition To Plaintiffs' Motion To Enforce Settlement Agreement ("Defendants' Supplemental Brief" or "Defs. Supp. Br.") and at the July 24, 2015 hearing on the Motion, Defendants recast their position as follows:

> **Defendants could use any word at all along with CLOUD in any size and in [any] manner with the sole conditions being only that the separate word be in close proximity to CLOUD and be readable. That is it[,] and importing any other concept of "unitary mark" necessarily deviates from what the parties defined unitary mark to mean. Applying the definition used in the settlement agreement leaves no doubt that Defendants['] mark is indeed a "unitary mark" as defined by the settlement agreement because the word 'PEN' is both readable and in close proximity to the word "CLOUD . . . ."**

(Defs. Supp. Br. at 21-22) (emphasis in original).

Although the SA indisputably provides that Defendants have discretion in designing a unitary "CLOUD" mark, Defendants' most recent argument endeavors to take out of context the

penultimate sentence in Paragraph II(C) of the SA and utterly ignores the definition of "unitary trademark" set out in Paragraph II(B). Defendants' argument also ignores the repeated and strict limitations -- as set forth in Paragraphs II(A) and (C) of the SA -- on Defendants' use of "CLOUD" **only** within a unitary mark.

### B. The Applicable Precedent Bearing On The Analysis Of Whether Defendants' "CLOUD PEN" Mark Constitutes A Unitary Mark Under The SA.

The unitary mark definition set forth in Paragraph II(B) of the SA appears to be a succinct statement of the applicable precedent regarding unitary marks. Critically, that definition, like the controlling precedent, requires "a group of works or symbols that are considered a single trademark" and that "the average consumer would view . . . [collectively] as a single trademark." (SA II(B).)

Generally, hallmarks or "observable characteristics" of a unitary mark are:

> [I]ts elements are inseparable. In a unitary mark, these observable characteristics must combine to show that the mark has a distinct meaning of its own independent of the meaning of its constituent elements. In other words, a unitary mark must create a *single* and distinct commercial impression. This test for unitariness requires the Board to determine "how the *average purchaser* would encounter the mark under normal marketing of such goods and also . . . what the reaction of the average purchaser would be to this display of the mark."

Dena Corp. v. Belvedere Int'l, Inc., 950 F.2d 1555, 1561 (Fed. Cir. 1991) (citation omitted; emphasis added.) This definition is essentially the same as that used in Paragraph II(B) of the SA, which contains visual terms, such as "view;" considers the perspective of "the average

consumer;" and requires the creation of a "single" impression. (SA II(B).)

Several factors are considered in determining whether a mark is unitary:

> whether it is physically connected to the mark by lines or other design features; how close the matter is located to the mark and whether side by side on the same line; the meaning of the words and how the meaning relates to each other and to the goods.

Dena Corp., 950 F.2d at 1561 (citing TMEP § 807.13(a) (rev. 1986).) In recognition of these factors, the unitary mark definition in the SA expressly provides that the "elements" of the required unitary mark must be "so closely aligned and situated" as to be "view[ed] . . . as a single trademark." (SA II(B).)

However, "[t]he mere proximity of [words] to the unrelated design feature does not endow the whole with a single, integrated, and distinct commercial impression" when "[n]o evidence suggests that a potential purchaser would perceive this mark to convey a single inseparable impression." B. Kuppenheimer & Co. v. Kayser-Roth Corp., 326 F.2d 820, 822 (C.C.P.A. 1964). For example, the unitary mark at issue in B. Kuppenheimer[4] forces consumers to perceive the design as a unitary symbol, because the words in the mark are physically paired through the shared double "P" design and are drawn in similarly-sized, bold fonts. Thus, the Kuppenheimer mark is unitary, because it is visually and conceptually unified such that its merely descriptive elements contribute to, and become inseparable from, the new meaning created by combining all of its elements.

---

[4] "Kuppenheimer" SUP-PANTS

Unitary marks incorporating common descriptive words may have difficulty in meeting the unitary mark standard.  When an essential element of a mark is merely descriptive, such that an average consumer would perceive it as separate from the mark as a whole, the mark is not unitary.  For example, in In Re Ginc Uk Ltd., 90 U.S.P.Q.2d 1472, p.4 (P.T.O. Sept. 4, 2007), the trademark "ZOGGS TOGGS," which incorporated a misspelled version of "togs" (a generic word for "clothes"), was held not to be a unitary mark, because the words were not physically linked, the rhyming quality imparted no new or different meaning to "TOGGS," and "TOGGS" was considered to be a common descriptor of clothes.  Accordingly, average consumers were likely to perceive "TOGGS" as separate and inferior to the dominant "ZOGGS."  (*Id.* at p.3.)

Similarly in In Re Brown-Forman Corp., 81 U.S.P.Q.2d 1284 (P.T.O. Nov. 14, 2006), the phrase "GALA ROUGE," literally meaning "red party," was held not to be a unitary mark as used in association with red wine, because:

> purchasers encountering GALA ROUGE, as applied to wine, [would] view GALA as the brand name, and ROUGE as the color or type of wine.  [Therefore, the] combining of GALA with ROUGE does not suffice to eliminate or negate the merely descriptive significance of ROUGE as applied to wine, and ROUGE therefore must be disclaimed apart from the mark.

*Id.* at p.5.

In contrast, in In Re Kraft, Inc., 218 U.S.P.Q. (BNA) (P.T.O. Mar. 28, 1983), the mark "LIGHT N' LIVELY," as used in association with low-calorie mayonnaise, was held to be unitary because:

> "LIGHT N' LIVELY" as a whole has a suggestive significance which is distinctly different from the merely descriptive significance of the term "LIGHT" per se.  That

is, the merely descriptive significance of the term "LIGHT" is lost in the mark as a whole. Moreover, the expression as a whole has an alliterative lilting cadence which encourages persons encountering it to perceive it as a whole. For these reasons, we believe that purchasers will not go through the mental process of breaking the mark "LIGHT N' LIVELY" into its component elements but will rather regard it as a unitary mark.

In Re Kraft, Inc., 218 U.S.P.Q. (BNA) ¶ 571 (P.T.O. Mar. 28, 1983)

Merely descriptive elements or words employed in unitary marks must impart new meaning to the mark as a whole. The descriptive term "LIGHT" in In Re Kraft not only contributes to the alliterative cadence of the phrase but also evokes a cheerful feeling from the consumer, overshadowing the merely descriptive meaning of "LIGHT" as indicative of fewer calories. This effect was found to be absent from the "GALA ROUGE" mark in In Re Brown-Forman and the "ZOGGS TOGGS" mark in In Re Ginc, which convey no new and *singular meaning* by incorporating descriptors, regardless of the flow of "GALA ROUGE" or the rhyming quality of "ZOGGS TOGGS."

### C. Defendants' "CLOUD PEN" Mark Is Not A Unitary Mark Under The SA.

Plaintiffs argue that Defendants' "**CLOUD** PEN"[5] mark is not a unitary mark under the SA for the following reasons: (1) Defendants' use of "**CLOUD**" in conjunction with "PEN" does not create a singular visual impression such that average consumers would perceive the mark as

---

[5]



9

unitary (Pls. Supp. Br. at 3-4); and (2) the word "pen" is merely descriptive and, as used in the "**CLOUD** PEN" mark, does not create a unitary conceptual impression in the minds of average consumers (*id.* at 4).

Defendants' use of "**CLOUD**" in conjunction with "PEN" in their trademark does not create a unitary visual impression. As Plaintiffs correctly assert, "combining the dominant word 'CLOUD' with tiny letters of the generic descriptor 'pen' on a different line in a different font and a different color -- does not constitute a unitary mark." (Pls. Supp. Br. at 3.) Defendants' design would lead an ordinary consumer to encounter the mark as three separate elements, not an "indivisible symbol." See B. Kuppenheimer, 326 F.2d at 822. No lines or designs unite "**CLOUD**" with "PEN"; the words "**CLOUD**" and "PEN" are typed in significantly different size fonts; and neither "**CLOUD**" nor "PEN" nor the circular design are side-by-side, on the same line, or in any way interconnected. Additionally, the white backdrop does little to connect Defendants' elements -- in fact, the faded-blue font used for "PEN" is difficult to read despite the white backdrop, particularly because the circular design incorporates a slightly bolder shade of blue, which further downplays the faded-blue used for "PEN."[6] (Pls. Supp. Br. at 4, n.2.) Defendants' use of "**CLOUD**" does not create a unitary visual impression, and thus, it is not used in a unitary mark.

Plaintiffs also argue Defendants' use of "PEN" beneath "**CLOUD**" is merely descriptive and does not create a unitary conceptual impression. (Pls. Supp. Br. at 4.) Defendants' mark is not conceptually unitary, because the elements do not create a uniform meaning that is different than that created by its individual elements taken separately. As in In Re Brown-Forman, in which "GALA ROUGE" was not a unitary mark because "ROUGE" was merely descriptive of the type of wine on which the mark appeared, Defendants' use of "PEN" is merely descriptive of their product, *i.e.*, vaporizer pens. See In Re Brown-Forman, 81 U.S.P.Q.2d 1284, at p.5. Indeed, the SA specifically acknowledges that "'pen' -- [is] a common descriptor of compact vaporizers." (SA

---

[6] This effect is magnified when the mark is portrayed online in shrunken form.

II(B).) In addition, placing "PEN" below "**CLOUD**" in small letters, and in a different font and color, encourages average consumers to perceive "PEN" as a descriptive sub-term, rather than as an inseparable part of the brand or mark

The elements that comprise Defendants' mark do not combine to form a unitary visual and conceptual impression, so as to constitute a unitary mark from the perspective of an average consumer in the marketplace. The impression conveyed by Defendants' "**CLOUD** PEN" mark is that of a dominant "**CLOUD**" trademark followed by a clearly secondary product descriptor, "PEN." In breach of the SA, the words "**CLOUD**" and "PEN" are neither "closely aligned" nor situated in a manner that conveys the impression of a "single trademark." The word "PEN" in the "**CLOUD** PEN" trademark may be "readable," but that alone is not enough to "constitute a unitary mark" as the SA plainly dictates. Because Defendants' use of "**CLOUD**" does not create a unitary conceptual impression, it is not a unitary mark.[7]

---

[7] Without discussing confidential settlement communications, the Court notes that settlement conferences were held before the Court on January 15, 2014 (Dkt. No. 61) and February 5, 2014 (Dkt. No. 63), at which time Defendants were using the mark set forth below. That mark comes closer to meeting the unitary mark standard than Defendants' present "**CLOUD** PEN" mark does. (*See* Declaration of Brett Albanese In Response To July 22, 2015 Order Of The Court ("Albanese Decl.") at 3.) The elements of the below mark are visually unified, because the cursive "CLOUD" touches both the cloud-outline and the "PENZ" subscript. The flowing font used in the trademark below also creates conceptual unity and suggests a new meaning by evoking the quality of light and smooth motion -- as of a cloud or puff of vapor. The one drawback of the design is that the word "PENZ," while a fanciful alternative to the common descriptors "pen" and "pens," is barely legible (especially in small-print online). However, Defendants would likely create a unitary mark if they enlarged "PENZ" and directly connected it to the word "CLOUD" to form a fictitious word -- "*CLOUDPENZ*" -- and combined this new word with the cloud-outline. Together, the interconnected words and cloud symbol would convey a new meaning, collectively reminding the onlooker of a flowing puff of vapor.

Finally, incorporating the flowing font into the mark would also serve to distinguish Defendants' "**CLOUD** PEN" mark, first used "in or around May 2014" (Albanese Decl. at 4 ¶ 8), from Plaintiffs' mark, which utilizes a font very similar to that used by Defendants "**CLOUD** PEN" mark. (*Contrast* Defendants' mark depicted in Albanese Decl. ¶ 8 *with* Plaintiffs' mark depicted in Declaration of Vahan Eksouzian, filed on July 23, 2015, Ex. 3 at 13.) This would further the SA's purpose of "limit[ing] the potential for consumer confusion" (SA I(D)).



11

1 **II. DEFENDANTS MUST PAY PLAINTIFFS $35,000 AND CEASE USING THE**
2 **MARKS "CLOUD" AND "CLOUD 2.0" IN ASSOCIATION WITH THEIR**
3 **PRODUCTS, AS REQUIRED BY THE SA.**

5 **A. Plaintiffs' Factual Allegations Regarding Defendants' Failure To**
6 **Make The Second Settlement Payment And Continued Use Of**
7 **"Cloud" And "Cloud 2.0" Are Undisputed.**

9 Plaintiffs allege that Defendants failed to pay the second installment of $35,000 in violation
10 of Paragraph II(G) of the SA. (Pls. Supp. Br. at 2.) Paragraph II(G) of the SA provides:
11 "Defendants shall pay Plaintiffs the sum of $70,000.00, in two equal installments of $35,000.00
12 . . . so as to be received ninety (90) days after full execution of this Settlement Agreement."
13 Defendants have not paid the second installment of $35,000, which was due 90 days after the
14 July 9, 2014 execution of the SA. (SA II(G).)

16 Plaintiffs also allege that Defendants breached the SA by continuing to use the marks
17 "CLOUD" and "CLOUD 2.0" in violation of Paragraph II(A) of the SA. (Pls. Supp. Br. at 2.)
18 Paragraph II(A) of the SA provides: "Defendants, and each of them, shall cease using the phrase
19 'Cloud 2.0,' 'Cloud Vapes,' or 'Cloud'." (SA II(A).) No run-off period, which would have allowed
20 Defendants to sell the remainder of their CLOUD 2.0 supply, was provided in the SA.
21 Nevertheless, Defendants continued to sell CLOUD 2.0 vaporizer pens through at least June 1,
22 2015 (Pls. Supp. Br. at 1), and "some use of the term 'Cloud' standing alone" was apparently
23 ongoing until at least July 23, 2015 (Albanese Decl. at 2 ¶ 3).

25 Defendants do not dispute Plaintiffs' above-described allegations. Rather, Defendants
26 allege that Plaintiffs fraudulently induced them into entering the SA (Defs. Opp. at 8) and that
27 Plaintiffs materially breached the SA by: using "#cloudpen" and "#cloudpenz" in association with
28 social media contests; and disparaging Defendants via social media posts and in telephonic

communications between Plaintiffs' employees and Jason Bell on or around September 11, 2015. Defendants maintain that, as a consequence of these material breaches, they have been relieved of their obligation to perform under the SA. (*Id.* at 11)

Accordingly, unless Defendants prevail on their fraudulent inducement or material breach claims, Defendants are not entitled to rescission and must pay Plaintiffs $35,000, cease the sale of CLOUD 2.0 vaporizer pens, and cease their use of "CLOUD" standing alone.

### B. Defendants' Fraudulent Inducement And Material Breach Claims Are Without Merit.

#### 1. Defendants Proffer No Evidence Of Fraudulent Inducement.

Defendants argue that Plaintiffs fraudulently induced them into entering the SA, thus entitling Defendants to rescind the SA. (Defs. Opp. at 10.)

"A [p]laintiff in an action on a fraudulent promise must produce evidence of the promisor's intent to mislead him." Tenzer v. Superscope, Inc., 39 Cal. 3d 18, 30 (1985). Further, "fraudulent intent has been inferred from such circumstances as [a] defendant's insolvency, his hasty repudiation of the promise, his failure even to attempt performance, or his continued assurances after it was clear he would not perform." *Id.* However, "something more than nonperformance is required to prove the defendant's intent not to perform his promise." *Id.* (citing People v. Ashley, 42 Cal.2d 246, 263 (1954)).

Defendants proffer no evidence suggesting that Plaintiffs never intended to abide by the terms of the SA. Indeed, Defendants' assertion of a fraudulent inducement defense to their obligations under the SA is wholly conclusory. They cite no *facts* to support their barebones

allegation, nor do they provide the Court with any reason to believe they could do so. Put otherwise, they proffer no basis for further factual development of this bald assertion. Further, both parties were competently represented at the execution of the SA, and each party claims to have "carefully read" the SA before signing. (SA VI(B).) Accordingly, the Court has no reason to believe that Plaintiffs fraudulently induced Defendants into entering the SA, and Defendants' claim that Plaintiffs fraudulently induced Defendants into signing the SA is without merit.

### 2. Plaintiffs' Use Of "#cloudpen" Was Merely Descriptive And Did Not Breach Paragraph II(B) Of The SA.

Defendants allege Plaintiffs materially breached the SA by using "#cloudpen" in posts on www.instagram.com (Instagram), and by holding promotional contests that encouraged consumers to use "#cloudpen" in violation of Paragraph II(B) of the SA. (Defs. Opp. at 8, 10.; *see also* Defs. Supp. Br. at 12-13.)

Paragraph II(B) provides, in relevant part, that:

> Plaintiffs may use the words CLOUD, CLOUD V, and/or CLOUD VAPES standing alone as trademarks. Plaintiffs shall refrain from using the words CLOUD, CLOUD V, and/or CLOUD VAPES in close association with the words "pen", "penz", "fuel", "pad" (e.g., CLOUD PENS, CLOUD FUEL, CLOUD PAD would not be permitted uses under this Agreement by Plaintiffs) *in association with Plaintiffs' products as a unitary trademark*. . . . Notwithstanding anything herein to the contrary, Plaintiffs are not precluded from accurately referring to products that they sell in literature, brochures, marketing material and the like, e.g., describing their compact vaporizer product as a "pen" -- a common descriptor of compact vaporizers. If Plaintiff sells a pen, Plaintiff may describe its product as a pen, however, what *Plaintiff may not do is create a unitary trademark* (as has been defined here) which includes CLOUD

14

in close association with the words "pen", "pens", "penz", "pad", or "fuel". (SA II(B)) (emphasis added).

"A 'hashtag' is a form of metadata comprised of a word or phrase prefixed with the symbol '#' (e.g., #chicago, #sewing, and #supremecourtdecisions)." (TRADEMARK MANUAL OF EXAMINING PROCEDURE, ¶ 1202.18 (Wolters Kluwer eds., 2014), 2014 WL 5799282.) "The addition of the term HASHTAG or the hash symbol (#) to an otherwise unregistrable mark typically cannot render it registrable." (*Id.*) Specifically:

> A mark comprising or including the hash symbol (#) or the term HASHTAG is registrable as a trademark or service mark only if it functions as an identifier of the source of the applicant's goods or services. Generally, the hash symbol and the wording HASHTAG do not provide any source-indicating function because they merely facilitate categorization and searching within online social media (*i.e.*, social-media participants are directed to search a particular subject by typing, *e.g.*, "hashtag ABC," where ABC is the subject).

(*Id.*) Further, "if a mark consists of the hash symbol or the term HASHTAG combined with wording that is merely descriptive or generic for the goods or services, the entire mark must be refused as merely descriptive or generic." (*Id.*)

Defendants' argument fails, because Paragraph II(B) only prohibits Plaintiffs' use of "CLOUD PEN," or "CLOUD PENZ" "in association with Plaintiffs' products as a unitary mark." Plaintiffs did not breach the SA through their use of "#cloudpen," because hashtags are merely descriptive devices, not trademarks, unitary or otherwise, in and of themselves. Paragraph II(B) fully permits Plaintiffs to utilize "CLOUD" in close association with "pen" as a descriptor, *so long as the use does not constitute a unitary mark*. "Plaintiffs' use of the hashtag '#cloudpen' is merely a functional tool to direct the location of Plaintiffs' promotion so that it is viewed by a

15

group of consumers," not an actual trademark. (Pls. Supp. Br. at 12; *see also* Fryer Decl. ¶¶ 7-17.)

In sum, Plaintiffs did not materially breach the SA by using the generic descriptor "pen" in close association with "CLOUD" *as a hashtag* on Instagram.[8]

### 3. Plaintiffs' Telephonic Disparagement Does Not Constitute A Material Breach Of The SA.

Defendants also argue for rescission of the SA on the grounds that Plaintiffs' employees, Lily Harutyunyan and Michael Hesser, violated Paragraph II(E) of the SA by disparaging Defendants in two telephonic conversations with Jason Bell on September 11, 2014.[9] (Defs. Opp. at 4; *see also* Defs. Supp. Br. at 19.) Paragraph II(E) of the SA states: "The parties shall not disparage one another, or otherwise make any false or misleading statements regarding any of the Parties' respective products or businesses."

"When a party's failure to perform a contractual obligation constitutes a material breach

---

[8] Apparently, Plaintiffs have used "cloudpenz" as a hashtag and Defendants have used "cloudvapes" as a hashtag. Even if such uses do not constitute a contractual breach, if consumer confusion is to be avoided, such uses are improvident and should stop.

[9] Plaintiffs argue that the tape recordings of these conversations, which have been submitted by Defendants as exhibits, are inadmissible, because Defendants illegally recorded Mr. Bell's conversations with both Mr. Hesser and Ms. Harutyunyan, without their consent. (Pls. Supp. Br. at 16.) Further, Mr. Hesser allegedly spoke to Mr. Bell using his business cellular telephone. (*Id.*) Under Cal. Pen. Code §632.7, it is illegal to record any cellular telephone conversation, whether or not it involves a confidential communication, without consent from all parties to a communication. Flanagan v. Flanagan, 27 Cal.4th 766, 771 n.2 (2002).

Notwithstanding what may be proper evidentiary objections to the admission of improperly recorded tapes into evidence, the Court has carefully listened to and considered the audio-tapes of these conversations to determine whether, if admitted, the taped conversations would establish a material breach of the SA. As discussed above, the Court concludes that they do not.

Because the Court has considered the content of the tapes: there is no need for an evidentiary hearing, as requested by Defendants; there also is no justification for striking in its entirety Plaintiffs' Motion, or any other pleading filed in support of Plaintiffs' Motion, based on the withdrawal of the Harutyunyan and Hesser Declarations; and Defendants' Evidentiary Objections To The Declaration Of Noune Sarkissian ("Defendants' Evidentiary Objections"), which appear to be without merit in any event, are unnecessary. Accordingly, the Court DENIES Defendants' Evidentiary Objections (Dkt. 147) and Defendants' Objection And Motion To Strike (Dkt. 157).

of the contract, the other party may be discharged from its duty to perform." Brown v. Grimes, 192 Cal. App. 4th 265, 277 (2011). Material breach occurs when a party's failure to perform goes "to the root" or "essence" of a contract, undermining "the fundamental purpose." *See* 23 *Williston on Contracts* § 63:3 (4th ed.)  However, "[t]he law sensibly recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated." Superior Motels, Inc. v. Rinn Motor Hotels, Inc., 195 Cal. App. 3d 1032, 1051 (1987). Hence, in the event of partial breach, damages may be sought, but the contract will not be rescinded. *See* Sackett v. Spindler, 248 Cal. App.2d 220, 229 (1967). Whether a breach is material depends on a number of factors, including: whether the injured party will likely obtain substantial performance under the contract; the seriousness of the breach (Brown, 192 Cal. App. 4th 278); and whether the injured party could be compensated by damages from the breach (Sackett, 248 Cal. App.2d 229).

Assuming *arguendo* that both of these conversations do reflect breaches of the non-disparagement provision of the SA,[10] this breach is not material, because the disparagement at issue by Plaintiffs' employees did not undermine the fundamental purpose of the SA such that Defendants' performance of their contractual obligations under the SA should be excused. In fact, the seriousness of the breach -- which is not alleged to have resulted in any damage to Defendants -- seems minimal, particularly in the light of the fundamental purposes of the agreement expressly stated by the parties in their SA "Recitals." As set forth in the SA, the parties sought:

> to enter into this settlement agreement to fully and finally resolve the Action and

---

[10] Although Ms. Harutyunyan referred to Defendants' products as "counterfeit," explaining "so they came out second, and it's just . . . they put the same name," the Court notes that Ms. Harutyunyan likely did not know the legal significance of her use of the term "counterfeit." When asked to clarify what she meant by "counterfeit," Ms. Harutyunyan responded: "Yeah, they came out second." Ms. Harutyunyan's response suggests that she may not have meant to disparage Defendants by referring to their products as "counterfeit." Rather, she meant to convey only that Defendants' products were released after Plaintiffs' products (under the name Cloud 2.0). Mr. Hesser's comments, unlike those of Ms. Harutyunyan, are plainly disparaging.

17

any and all claims, rights, liabilities, causes of action and disputes that might exist as of the time of entering into this Settlement Agreement, and to avoid the cost and uncertainty of continued litigation as well as to make provisions ***to limit the potential for consumer confusion as the Parties compete in the future***.

(SA I(D)) (emphasis added).

The Court cannot assume that these particular instances of disparagement substantially undermine these fundamental aims. Whether Defendants could be compensated by damages for Plaintiffs' breach is irrelevant, because Defendants proffer no evidence whatsoever that they suffered any damage as a result of Plaintiffs' alleged breach. In fact, Defendants do not even allege that Plaintiffs' comments dissuaded Mr. Bell from doing business with Defendants. Accordingly, rescission of the SA, based on isolated, disparaging comments made by two non-control-group employees, is not supported by the applicable precedent.

### 4. Plaintiffs' Instagram Communication Does Not Constitute Disparagement.

Defendants argue Plaintiffs breached Paragraph II(E) of the SA by disparaging Defendants on Instagram, thus entitling Defendants to rescind under the material breach doctrine. (Defs. Opp. at 6, 10.)

Specifically, Defendants argue that Plaintiffs' April 15, 2015 response to an Instagram post by user "13mikey.d" violated Paragraph II(E) of the SA, constituting a material breach. (Defs. Opp. at 6, 10; *see also* Pls. Supp. Br. at 19.) The user posted the following:

> @cloudvapes I would like to Thank Sergio from @cloudvapes for taking my imitation Cloud Pen and "GIVING ME A NEW CLOUD VAPE PEN" at the cup in San

Berdoo […] He took me from fake to real, and the quality is way better.

(Defs. Opp. at 6 (emojis omitted).) In response, Plaintiffs commented: "glad you like it!" (*Id.*)

Defendants' argument fails, because Plaintiffs' response does not constitute disparagement of Defendants by Plaintiffs as defined in the SA. Plaintiffs' Instagram post does not refer to Defendants' product as an "imitation Cloud Pen," or a "fake." Plaintiffs merely ignore the negative components of the initial post comment posting their response. Nothing in Paragraph II(E) suggests that Plaintiffs have a duty to correct false or misleading statements made by others regarding Defendants' products. As such, because Plaintiffs' comment did not disparage Defendants' product under Paragraph II(E), Defendants are not entitled to rescission on this ground.

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that Defendants: (1) pay Plaintiffs the sum of $35,000 within ten (10) business days of the date of this Order; (2) cease selling CLOUD 2.0 vaporizers within ten (10) business days of the date of this Order; (3) cease using "CLOUD" standing alone in association with any of Defendants' products and promotions within ten (10) business days of the date of this Order; and (4) cease using the "**CLOUD** PEN" mark within thirty (30) days.[11]

///
///
///

---

[11] Paragraph VI(B) of the SA allows Plaintiffs to recover fees. However, if the Court had been asked to award fees it would have, in the light of Plaintiffs' failure to promptly withdraw substantially incorrect, and possibly perjurious, declarations made by Mr. Hesser and Ms. Harutyunyan (which were withdrawn following the July 24th hearing), only awarded Plaintiff half of the reasonable costs and fees they have incurred in connection with this Motion.

///

///

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order on counsel for Plaintiffs and for Defendants.

DATED: August 7, 2015

*Margaret A. Nagle*

MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE